UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------------x
TINA L. FARMER,

                        Plaintiff,                          Case No. 18-cv-2378

            v.

GENERAL MOTORS LLC,

                        Defendant.
------------------------------------------------------------------------x

## <u>COMPLAINT</u>

### INTRODUCTORY STATEMENT

Plaintiff TINA L. FARMER brings this action to recover for injuries she suffered in an accident caused by an ignition switch defect in her 2005 Chevrolet Cobalt TL, as well as for the economic loss she suffered when she sold her vehicle for less than she would have received but for GM's wrongdoing.

Ms. Farmer purchased her car on December 1, 2006. On December 8, 2013, she was driving, and her adult son and daughter were riding as passengers, when her car inexplicably turned off and lost power steering and power brake capabilities. Ms. Farmer was unable to keep it on the road. When her car finally came to a stop against a tree, no airbag deployed. Her car doors remained locked, with Ms. Farmer and her family trapped inside.

The accident aggravated Ms. Farmer's neck and back injuries, causing her to miss work as a janitor, and requiring her to extend physical rehabilitation services she had been receiving. She also had to pay to have her vehicle repaired. Until February 2014, Ms. Farmer had no idea, and no reason to know, that the accident was caused by a faulty ignition switch defect that General Motors LLC ("GM") and its predecessor, General Motors Corporation ("Old GM"), had known about for many years but concealed from government officials and from consumers, including Ms. Farmer.

In February 2014, GM publicly admitted that--for every single day of its existence as a new entity, distinct from Old GM—GM failed to disclose—and its engineers, lawyers, and other employees actively concealed--the dangers that use of millions of GM vehicles entailed. GM's season of shame began with its admission that it had concealed the ignition switch defect in some 1.6 million vehicles, including Ms. Farmer's Cobalt, a defect, described in greater detail below, causing death or serious injury to hundreds while GM knew but failed to disclose its danger. Since purporting to come clean about its wrongdoing, and after promising to transform a culture that let greed trump the dictates of responsible corporate conduct, GM has been forced to admit that its misconduct was far more widespread than its initial confession revealed. GM has since issued expanded recalls for more and more vehicles that present ignition switch dangers. GM has also issued or expanded prior recalls for a wide range of other safety hazards, a boggling tally of corporate irresponsibility, and a frighteningly sharp reflection of how widespread GM's reckless endangerment of the safety of Ms. Farmer and the public, in America and abroad, has been. Plaintiffs seek redress for GM's wrongdoing, and punitive damages in an amount sufficient to punish GM and to deter such misconduct in the future.

## PARTIES

1.      Ms. Farmer is a resident of the state of Maryland. She owns a 2005 Chevrolet Cobalt that she purchased in Maryland in 2006. The accident that is the subject of this lawsuit occurred in Maryland as well.

2.      Defendant General Motors LLC ("GM") is a Delaware limited liability company with its principal place of business located at 300 Renaissance Center, Detroit, Michigan, and is a citizen of the States of Delaware and Michigan. The sole member and owner of General Motors LLC is General Motors Holdings LLC. General Motors Holdings LLC is a Delaware

limited liability company with its principal place of business in the State of Michigan. The sole member and owner of General Motors Holdings LLC is General Motors Company, which is a Delaware Corporation with its principal place of business in the State of Michigan, and is a citizen of the States of Delaware and Michigan.

3.      GM was incorporated in 2009 and, effective on July 11, 2009, acquired substantially all assets and assumed certain liabilities of General Motors Corporation ("Old GM") through a Section 363 sale under Chapter 11 of the U.S. Bankruptcy Code. At all relevant times, GM expressly assumed obligations to comply with the certification, reporting and recall requirements of the National Traffic and Motor Vehicle Act and the Transportation Recall Enhancement, Accountability, and Documentation Act ("Tread Act"), with respect to vehicles manufactured by Old GM.  GM also agreed to bear liability for certain injuries caused by vehicles manufactured by Old GM whose defects cause or aggravate injuries from accidents, including Ms. Farmer.

## JURISDICTION AND VENUE

4.      This Court has diversity jurisdiction over this action under 28 U.S.C. §§ 1332(a) and (d) because the amount in controversy for the Plaintiff exceeds $75,000, and Plaintiff is a citizen of a different state than Defendant.

5.      This Court has personal jurisdiction over Plaintiff because Plaintiff submits to the Court's jurisdiction. This Court has personal jurisdiction over GM because GM conducts substantial business in this District, and some of the actions giving rise to the complaint took place in this District. This Court also has personal jurisdiction over GM under 18 U.S.C. § 1965 because GM is found in, has an agent in, or transacts business in this District.

6.      Venue is proper in this Court pursuant to 28 U.S.C. § 1404, by the consent of both parties.

## FACTUAL BACKGROUND

*1.      GM's Practice of Concealing and Minimizing Safety Risks*

7.      GM has admitted that Old GM equipped model year 2005-07 Chevrolet Cobalts, including Ms. Farmer's car, with a defective ignition switch. The defect consists of an ignition switch with too low torque, enabling the switch to move out of the "run" and into the "off" or "accessory" position under normal driving conditions. If this occurs, the car loses power steering and power brake capabilities. And if a collision occurs while the ignition switch is not in the "run" position, the vehicle's safety airbags will not deploy – increasing the risk of death and serious injury. Despite knowing that the ignition switch installed in Ms. Farmer's car was defective, Old GM failed to adequately warn her about the risk of harm and failed to recall the Vehicle.

8.      On July 10, 2009, the United States Bankruptcy Court for the Southern District of New York entered an order approving the June 26, 2009 Amended and Restated Master Sale and Purchase Agreement (the "Sale Order"), wherein GM acquired Old GM assets. Because Plaintiff asserts Products Liability claims within the meaning of the Sale Order, Plaintiff properly bases her Products Liability claims for compensatory damages on the conduct of both Old GM and GM. GM agreed to assume:

> [A]ll Liabilities to third parties for death, personal injury, or other injury to Persons or damage to property caused by motor vehicles designed for operation on public roadways or by the component parts of such motor vehicles and, in each case, manufactured, sold or delivered by Sellers (collectively, "Product Liabilities"), which arise directly out of accidents, incidents, or other distinct and discreet occurrences that happen on or after the Closing Date and arise from such motor vehicles' operation or performance.

4

GM also assumed responsibility for compliance with a wide range of laws and other regulations, including "the certification, reporting, and recall requirements of the National Traffic and Motor Vehicle Safety Act, the Transportation Recall Enhancement, Accountability and Documentation Act, the Clean Air Act, the California Health and Safety Code and similar Laws, in each case, to the extent applicable in respect of vehicles and vehicle parts manufactured or distributed by Seller [Old GM]."

9.      GM continued policies and practices of Old GM, and instituted its own, intended to conceal and minimize safety related risks in GM and Old GM products from Plaintiff, consumers, investors, litigants, courts, law enforcement officials, the NHTSA, and other governmental officials. In furtherance of its illegal scheme, GM trained and directed its employees and dealers to take various measures to avoid exposure of safety related product risks.

10.     GM deployed its campaign of deception on the day that GM began operating. The scheme continued at least until its exposure began in early 2014. Through its deception, GM recklessly endangered the safety of Plaintiff, her family, and members of the public. GM's wrongful acts and omissions harmed Ms. Farmer.

11.     The United States Department of Justice filed a criminal information against GM for its wrongful concealment of ignition switch defects in Ms. Farmer's vehicle and those of other consumers. GM has entered a deferred prosecution agreement with the Department in which GM admitted that it knew, at least since early 2012, that the ignition switch in Ms. Farmer's vehicle posed an unreasonable safety hazard. GM admitted that it failed to disclose the ignition switch hazard to Ms. Farmer, other consumers, or to government officials until February 2014, after hundreds of death and injuries resulted from the defective switch. GM also admitted that it knew that representations by GM and Old GM--that Plaintiffs' and class members' vehicles

were safe to drive--were false and that, until February 2014, GM failed to correct those misrepresentations.

12.    GM's Chief Executive Officer Mary Barra admitted on behalf of the company that GM employees knew about safety-related defects in millions of vehicles and that GM did not disclose those defects as it was required to do by law. Ms. Barra attributed GM's "failure to disclose critical pieces of information," in her words, to GM's policies and practices that mandated and rewarded the unreasonable elevation of cost concerns over safety risks. This case arises from GM's concerted and systematic practice and policy of denying, diminishing, and failing to remediate safety related hazards that GM vehicles pose.

13.    GM mandated that its personnel avoid exposing GM to the risk of having to recall vehicles with safety-related risks by limiting the action that GM would take with respect to such risks to the issuance of a Technical Service Bulletin or an Information Service Bulletin.

14.    GM directed its engineers and other employees to falsely characterize safety-related risks – including the risks described in this complaint – in their reports, business and technical records as "customer convenience" issues, to avoid being forced to recall vehicles as the relevant law requires, and/or to issue narrower recalls than the circumstances warranted.

15.    GM trained its engineers and other employees in the use of euphemisms to avoid disclosure to the NHTSA and others of the safety risks posed by risks in GM products.

16.    GM directed its employees to avoid the word "stall" in describing vehicles experiencing a moving stall, because it was a "hot word" that could alert the NHTSA and others to safety risks associated with GM products, and force GM to incur the costs of a recall.  A "moving stall" is a particularly dangerous condition because the driver of a moving vehicle in

such circumstances no longer has control over key components of steering and/or braking, and air bags will not deploy in any, increasingly likely, serious accident.

17.    GM instructed its engineers and other employees not to use the term "safety" and refer instead to "potential safety implications."

18.    GM instructed its engineers and other employees to avoid the term "defect" and substitute the phrase "does not perform to design."

19.    GM's managerial practices were designed to ensure that its employees and officials would not investigate or respond to safety-related risks, and thereby avoid creating a record that could be detected by governmental officials, litigants or the public.

15.    In a practice that GM management labeled "the GM nod," GM managers were trained to feign engagement in safety related product risks issues in meetings by nodding in response to suggestions about steps that the company should take. Protocol dictated that, upon leaving the meeting room, the managers would not respond to or follow up on the safety issues raised therein.

16.    GM's lawyers discouraged note-taking at critical product safety meetings to avoid creation of a written record and thus avoid outside detection of safety-related risks and GM's refusal to respond to and/or GM's continuing concealment of those risks. GM employees understood that no notes should be taken during meetings about safety related issues, and existing employees instructed new employees in this policy. GM did not describe the "no-notes policy" in writing to evade detection of their campaign of concealment.

17.    Old GM would change part design without a corresponding change in part number, to conceal the fact that the original part design was risk. Old GM and GM concealed the fact that Old GM manufactured cars with intentionally mislabeled ignition switch part numbers,

making the parts difficult for GM, Plaintiffs, class members, law enforcement officials, the NHTSA, and other governmental officials to identify. GM knew from its inception that the ignition switch part number irregularity was intended to conceal the faulty ignition switches in Plaintiffs' and class members' vehicles.

18.     GM directed dealers to misrepresent the safety risks associated with the product risks of its vehicles. GM followed this practice with respect to the dangerous ignition switches from its inception in October 2009 until its campaign of concealment of the ignition switch risk began to unravel in February 2014.

19.     GM directed its lawyers and any outside counsel it engaged to act to avoid disclosure of safety related risks in GM products. These actions included settling cases raising safety issues, demanding that GM's victims agree to keep their settlements secret, threatening and intimidating potential litigants into not bringing litigation against GM by falsely claiming such suits are barred by Order of the Bankruptcy Court, and settling cases for amounts of money that did not require GM managerial approval, so management officials could maintain their veneer of ignorance concerning the safety related risks. In one case, GM threatened the family of an accident victim with liability for GM's legal fees if the family did not withdraw its lawsuit, misrepresenting to the family that their lawsuit was barred by Order of GM's Bankruptcy Court. In another case, GM communicated to the family of the victim of a fatal accident caused by the faulty ignition switch that their claim has no basis, even though GM knew that its communication was false and designed to further GM's campaign of concealment and deceit. In other cases, GM falsely claimed that accidents or injuries were due to the driver when it knew the accidents were likely caused by the dangerous product risks GM concealed.

20.    The systematic concealment of known defects was deliberate, as GM followed a consistent pattern of endless "investigation" and delay each time it became aware of a given defect. GM routinely chose the cheapest part supplier without regard to safety, and discouraged employees from acting to address safety issues.

21.    Under the Transportation Recall Enhancement, Accountability and Documentation Act, 49 U.S.C. § 30101, et seq. ("TREAD Act"), and its accompanying regulations, when a manufacturer learns that a vehicle contains a safety defect, the manufacturer must properly disclose the defect. If it is determined that the vehicle is defective, the manufacturer may be required to notify vehicle owners, purchasers, and dealers of the defect, and may be required to remedy the defect.

22.    When a manufacturer with TREAD Act responsibilities is aware of safety defects and fails to disclose them as GM has done, the manufacturer's vehicles are not safe.

23.    The array of defects that GM had failed to disclose and has only in 2014 revealed includes: (1) ignition switch  defect, (2) power steering defect, (3) airbag defect (4) brake light defect, (5) shift cable defect, (6) safety belt defect, (7) ignition lock cylinder defect, (8) key design defect, (9) ignition key defect, (10) transmission oil cooler line defect, (11) power management mode software defect, (12) substandard front passenger airbags, (13) light control module defect, (14) front axle shaft defect, (15) brake boost defect, (16) low-beam headlight defect, (17) vacuum line brake booster defect, (18) fuel gauge defect, (19) acceleration defect, (20) flexible flat cable airbag defect, (21) windshield wiper defect, (22) brake rotor defect, (23) passenger-side airbag defect, (24) electronic stability control defect, (25) steering tie-rod defect, (26) automatic transmission shift cable adjuster, (27) fuse block defect, (28) diesel transfer pump defect, (29) base radio defect, (30) shorting bar defect, (31) front passenger airbag

end cap defect, (32) sensing and diagnostic module ("SDM") defect, (33) sonic turbine shaft, (34) electrical system defect, (35) seatbelt tensioning system defect, and (36) master power door switch defect.

24.     GM has received reports of crashes and injuries that put GM on notice of the serious safety issues presented by many of these defects.  Given the continuity of engineers, corporate counsel, and other key personnel from Old GM to GM, GM was aware of many of the defects from the very date of its inception on July 10, 2009.

2.     *GM's Failure to Disclose and Concealment of Ignition Switch Hazard*

25.     GM has admitted that the ignition switches in the vehicle owned by Ms. Farmer were dangerous and posed a safety hazard.  It recalled her car pursuant to NHTSA recall campaign 14V047000, a recall it publicly announced on February 14, 2014.

26.     GM has also admitted that, from its inception in 2009, various GM engineers, attorneys, and management officials knew of, and took measures to conceal, the ignition switch risk and/or diminish its significance. GM has been found guilty of failing to disclose this risk to Plaintiff, class members, and governmental officials as required by law, and the NHTSA has fined GM the maximum penalty that agency is authorized to impose.

27.     GM has known since June 10, 2009, that the faulty ignition switch in the Plaintiffs' vehicle posed a serious safety and public health hazard because the faulty ignition switch causes moving stalls in which the driver loses power steering, power brakes, and in the increased likelihood of an accident, the airbag will not deploy.

28.     Rather than notifying the NHTSA, GM instead decided that Plaintiff and millions of drivers and pedestrians would face imminent risk of injury and death due to the dangerous ignition switches in the vehicles. GM and other parties associated with it, including parts

10

suppliers, agreed to conceal safety related risks presented by the ignition switches from Plaintiff, law enforcement officials, other governmental officials, litigants, courts, and investors.

29.     The ignition switch in Old GM installed in Ms. Farmer's car was defective because it was prone to inadvertently moving from the "run" to the "accessory" or "off" position at any time during normal and proper operation.

30.     The ignition switch is most likely to move when the vehicle is jarred or travels across a bumpy road; if the key chain is heavy; if a driver inadvertently touches the ignition key with his or her knee; or for a host of additional reasons.

31.     When the ignition switch inadvertently moves out of the "run" position, the vehicle suddenly and unexpectedly loses engine power, power steering, and power brakes, and certain safety features are disabled, including the vehicle's airbags. This leaves occupants vulnerable to crashes, serious injuries, and death.

32.     GM was aware of safer alternative designs for airbag systems that would have prevented the non-deployment of airbags caused by the ignition defects, but chose not to employ them – whether by way of recall of Old GM vehicles or a design change for the GM-branded vehicles it manufactured – in part to avoid disclosure of the defective ignition switch and its tragic consequences.  GM knew of the ignition switch defects in Ms. Farmer's vehicle and the dangers they posed but GM concealed its knowledge from consumers and regulators.

     *3.*     *GM was aware of the defective ignition switch problem from the date of its inception.*

33.     On July 10, 2009, the United States Bankruptcy Court approved the sale of General Motors Corporation, which was converted into General Motors, LLC, or  GM. From its creation, GM, which retained the vast majority of Old GM's senior level executives and engineers as well as Old GM's books and records, knew that Old GM had manufactured and sold

millions of vehicles afflicted with the ignition switch defects. GM chose to hire the same Old

GM personal who possessed that knowledge; that knowledge is reflected in documents generated

during the days of Old GM that transferred to GM in the bankruptcy sale; that knowledge was

germane to the responsibilities of the transferred GM employees when they were acting within

the scope of their employment with Old GM; and that knowledge was germane to the

responsibilities of the GM employees acting within the scope of their employment with GM. In

light of its knowledge of the ignition switch defects, and the myriad other defects, GM was

obligated to disclose these risks to Ms. Farmer, a duty which it breached.

34.     In part, GM's knowledge of the ignition switch defects arises from the fact that

key personnel with knowledge of the defects were employed by GM when Old GM ceased to

exist. Moreover, many of these employees held managerial and decision-making authority in Old

GM, and accepted similar positions with GM. For example, the design research engineer who

was responsible for the rollout of the defective ignition switch in the Saturn Ion was Ray

DeGiorgio. Mr. DeGiorgio continued to serve as an engineer at GM until April 2014, when he

was suspended (and ultimately fired) as a result of his involvement in the ignition switch crisis.

35.     Mr. DeGiorgio was hardly the only employee who retained his Old GM position

with GM. Other Old GM employees with knowledge of the ignition switch defects and other

defects who were retained and given decision-making authority in GM include: current CEO

Mary T. Barra; Director of Product Investigations Carmen Benavides; Safety Communications

Manager Alan Adler; Program Engineering Manager Gary Altman; Engineer Eric Buddrius,

Engineer Jim Federico; Vice Presidents for Product Safety John Calabrese and Alicia Boler-

Davis; Warranty Engineer William K. Chase; Engineer James Churchwell; Senior Manager for

TREAD Reporting Dwayne Davidson; Electrical Engineer John Dolan; Engineer and Field

Performance Assessment Engineer Brian Everest; Sensing Performance Engineer William Hohnstadt; Vice President of Regulatory Affairs Michael Robinson; Director of Product Investigations Gay Kent; Product Investigations Engineer Elizabeth Kiihr; Engineer Alberto Manzor; Field Performance Assessment Engineer Kathy Anderson; General Counsel and Vice President Michael P. Milliken; Vehicle Chief Engineer Doug Parks; Brand Quality Manager Steven Oakley; Field Performance Assessment Engineer Manuel Peace; Manager of Internal Investigations Keith Schultz; Field Performance Assessment Engineer John Sprague; Field Performance Assessment Engineer Lisa Stacey; Design Engineer David Trush; Product Investigations Manager Douglas Wachtel; in-house counsel Douglas Brown; attorney Michael Gruskin (who at one point headed GM's product litigation team and chaired the Settlement Review Committee from September 2007 to March 2102); in-house product liability attorney Jaclyn C. Palmer; and in-house product liability lawyer William Kemp.

36.     A number of GM employees lost their jobs as a result of the ignition switch scandal, including: Michael Robinson; William Kemp; Ray DeGiorgio; Gary Altman; Jaclyn Palmer; Ron Porter; Lawrence Buonomo; Jennifer Sevigny; Gay Kent; Carmen Benavides; Maureen Foley-Gardner; Jim Federico; John Calabrese; and Brian Stouffer.

37.     The Bankruptcy Court found that "at least 24 Old GM personnel (all of whom were transferred to GM), including engineers, senior managers, and attorneys, were informed or otherwise aware of the Ignition Switch Defect…." Based on this fact, the court concluded that "Old GM personnel knew enough as of … June 2009 ... for Old GM then to have been obligated, under the Safety Act, to conduct a recall of the affected vehicles." These same 24 personnel had the same knowledge when they went to work at the same positions in  GM.

38.    GM had ongoing obligations under the Safety Act to monitor GM- branded vehicles and Old GM vehicles on the road, to make quarterly reports to NHTSA, and to maintain all relevant records for five years. GM explicitly accepted Safety Act responsibilities for Old GM vehicles in § 6.15 of the Sale Agreement through which it acquired Old GM.

39.    The Safety Act and related regulations require the quarterly submission to NHTSA of "early warning reporting" data, including incidents involving death or injury, claims relating to property damage received by the manufacturer, warranty claims paid by the manufacturer, consumer complaints, and field reports prepared by the manufacturer's employees or representatives concerning failure, malfunction, lack of durability, or other performance issues. 49 U.S.C. § 30166(m)(3); 49 C.F.R. § 579.21. Manufacturers must retain for five years all underlying records on which the early warning reports are based and all records containing information on malfunctions that may be related to motor vehicle safety. 49 C.F.R. §§ 576.5 to 576.6.

40.    The Safety Act further requires immediate action when a manufacturer determines or should determine that a safety defect exists. A safety defect is defined by regulation to include any defect that creates an "unreasonable risk of accidents occurring because of the design, construction, or performance of a motor vehicle" or "unreasonable risk of death or injury in an accident. Within five days of learning about a safety defect, a manufacturer such as GM must notify NHTSA  and provide a description of the vehicles potentially containing the defect, including "make, line, model year, [and] the inclusive dates (month and year) of manufacture," a description of how these vehicles differ from similar vehicles not included in the recall, and "a summary of all warranty claims, field or service reports, and other information" that formed the basis of the determination that the defect was safety related. 49 U.S.C. § 30118(c); 49 C.F.R. §§

573.6(b)-(c). Then, "within a reasonable time" after deciding that a safety issue exists, the manufacturer must notify the owners of the defective vehicles. 49 C.F.R. §§ 577.5(a), 577.7(a).

41.     The same employees carried out the TREAD Act obligations at Old GM and GM, and were responsible for monitoring and reviewing the same databases and documents in order to ensure compliance with the TREAD Act. They retained the knowledge they acquired at Old GM. Dwayne F. Davidson headed-up the TREAD reporting team at both Old and NGM. Mr. Davidson and the other TREAD reporting team members at GM (who held the same roles at Old GM) had knowledge of pre-Sale events and they were required to act on that knowledge under the Sale Agreement in which GM undertook to monitor Old GM vehicles for safety defects and promptly disclose and remedy any such defects GM knew about. As Mr. Davidson, his subordinates and others at GM were well-aware, from 2003- 2007 or 2008, the TREAD Reporting team had between eight and twelve employees who would conduct monthly searches and prepare scatter graphs to identify spikes in the number of accidents or complaints with respect to various Old GM vehicles.

42.     As Mr. Davidson and his subordinates at Old GM who stayed on at GM were aware, and therefore GM was aware, in or around 2007-08, Old GM reduced the TREAD Reporting team from eight to three employees, and pared down the monthly data mining process.  In 2010, GM restored two people to the team, but they did not participate in the TREAD database searches Moreover, until 2014, the TREAD Reporting team at NGM did not have sufficient resources to obtain any of the advanced data mining software programs available in the industry to better identify and understand potential defects.

43.      In his deposition, Mr. Davidson, the senior manager of the TREAD team at both Old GM and GM, testified that he did not have the necessary expertise, manpower or resources,

and the team did not have the right people in place after the bankruptcy to enable the team to perform effectively.

44.    By depriving the TREAD Reporting team of the resources it needed to identify potential safety issues, GM helped to ensure that safety issues would not come to light.

45    In addition, GM knew that those personnel entering data for TREAD Act purposes were trained to avoid reporting items that would look bad to outsiders. GM Employees had been instructed to "consider how documents will be interpreted by people outside GM" and to avoid specified words in their communications.

46.    At or shortly after it came into existence, GM knew of the following facts either from knowledge in the minds of GM employees acting within the scope of their authority or from the books and records of Old GM, which GM acquired in the bankruptcy sale and which it and its employees were required to act upon based on the TREAD Act obligations GM expressly assumed in § 6.15 of the Sale Agreement. GM knew that the ignition switch posed an unreasonable threat to safety because the ignition switch, in ordinary driving circumstances, could inadvertently turn from the "run" to the "accessory" or "off" position. GM also knew that when the ignition switch moved from "run" to "accessory" or "off," the vehicle's engine would stall and/or lose power, power steering and power brakes would not function, and airbags would not deploy.

47.    GM knew that Delphi Mechatronics ("Delphi"), the manufacturer of many of the defective ignition switches in the Defective Ignition Switch Vehicles, including those in the vehicles that gave rise to the February and March 2014 recalls, informed Old GM that the ignition switch did not meet Old GM's design specifications. Rather than delay production of the in order to ensure that the ignition switch met specifications, Old GM's design release engineer,

Ray DeGiorgio, simply lowered the specification requirements and approved use of ignition switches that he knew did not meet Old GM's specifications.

48.    GM knew that in 2004, Old GM engineers reported that the ignition switch was so weak and the ignition placed so low on the steering column that the driver's knee could easily bump the key and turn off the vehicle.

49.    GM knew that this defect was sufficiently serious for an Old GM engineer to conclude, in January 2004, that "[t]his is a basic design flaw and should be corrected if we want repeat sales."

50.    GM knew that a July 1, 2004 report by Siemens VDO Automotive analyzed the relationship between the ignition switch in Old GM vehicles and the airbag system. The Siemens report concluded that when an Old GM vehicle experienced a power failure, the airbag sensors were disabled. The Siemens report was distributed to at least five Old GM engineers, most or all of whom continued on at GM. The Chevrolet Cobalt was in pre-production at this time.

51.    GM knew that, in 2001, during pre-production testing of the 2003 Saturn Ion, Old GM engineers learned that the vehicle's ignition switch could unintentionally move from the "run" to the "accessory" or "off" position.  GM also knew that where the ignition switch moved from "run" to "accessory" or "off," the vehicle's engine would stall and/or lose power.

52.    GM knew that after considering a number of proposed solutions (including changes to the key position and measures to increase the torque in the ignition switch), the Current Product Improvement Team examining the issue decided to do nothing.

53.    GM knew that Old GM and GM engineer Gary Altman recently admitted that engineering managers (including himself and Ray DeGiorgio) knew about ignition switch problems in the Cobalt that could cause these vehicles to stall, and disable power steering and

brakes, but launched the vehicle anyway because they believed that the vehicles could be safely coasted off the road after a stall. Mr. Altman insisted that "the [Cobalt] was maneuverable and controllable" with the power steering and power brakes inoperable.

54.    GM knew that on February 28, 2005, Old GM issued a bulletin to its dealers regarding engine-stalling incidents in 2005 Cobalts and 2005 Pontiac Pursuits (the Canadian version of the Pontiac G5).

55.    GM knew that in the February 28, 2005 bulletin, Old GM provided the following recommendations and instructions to its dealers – but not to the public in general:

> There is potential for the driver to inadvertently turn off the ignition due to low key ignition cylinder torque/effort. The concern is more likely to occur if the driver is short and has a large heavy key chain. In the case this condition was documented, the driver's knee would contact the key chain while the vehicle was turning. The steering column was adjusted all the way down. This is more likely to happen to a person that is short as they will have the seatpositioned closer to the steering column. In cases that fit this profile, question the customer thoroughly to determine if this may be the cause.  The customer should be advised of this potential and to take steps, such as removing unessential items from their key chains, to prevent it.Please follow this diagnosis process thoroughly and complete each step. If the condition exhibited is resolved without completing every step, the remaining steps do not need to be performed.

56.    GM knew that on June 19, 2005, the NEW YORK TIMES reported that Chevrolet dealers were advising some Cobalt owners to remove items from heavy key rings so that they would not inadvertently move the ignition into the "off" position. The article's author reported that his wife had bumped the steering column with her knee while driving on the freeway and the engine "just went dead."

57.     GM knew that the NEW YORK TIMES contacted Old GM and GM employee Alan Adler, manager for safety communications, who provided the following statement:

> In rare cases when a combination of factors is present, a Chevrolet Cobalt driver can cut power to the engine by inadvertently bumping the ignition key to the accessory or off position while the car is running. Service advisers are telling

customers they can virtually eliminate the possibility by taking several steps, including removing nonessential material from their key rings.

58.     GM knew that, in connection with this NEW YORK TIMES article, Alder specifically told the editor that GM "had not had any complaints," which was false.

59.     GM knew that between February 2005 and December 2005, Old GM opened multiple Problem Resolution inquiries regarding reports of power failure and/or engine shutdown in the Delta Ignition Switch Vehicles.

60.     GM knew that one of these, opened by quality brand manager Steve Oakley in March 2005, was prompted by Old GM engineer Jack Weber, who reported turning off a Cobalt with his knee while driving. After Oakley opened the PRTS, Gary Altman advised that the inadvertent shut down was not a safety issue. Oakley still works at GM.

61.     GM knew that as part of the Problem Resolution, Oakley asked William Chase, an Old GM warranty engineer, to estimate the warranty impact of the ignition switch defect in the Cobalt and Pontiac G5 vehicles. Chase estimated that for Cobalt and G5 vehicles on the road for 26 months, 12.40 out of every 1,000 vehicles would experience inadvertent power failure while driving.

62.     GM knew that in September 2005, Old GM received notice that Amber Marie Rose, a 16-year old resident of Clinton, Maryland, was killed in an accident after her 2005 Chevrolet Cobalt drove off the road and struck a tree head-on. During Old GM's investigation, it learned that the ignition switch in Amber's Cobalt was in the "accessory" or "off" position at the time of the collision. Upon information and belief, Old GM subsequently entered into a confidential settlement agreement with Amber's mother. Old GM personnel familiar with Ms. Rose's fatal accident continued on at GM after the bankruptcy sale.

63.     GM knew that in December 2005, Old GM issued Technical Service Bulletin 05-02-35-007. The Bulletin applied to 2005-2006 Chevrolet Cobalts, 2006 Chevrolet HHRs, 2005-2006 Pontiac Pursuits, 2006 Pontiac Solstices, and 2003-2006 Saturn Ions. The Bulletin explained that "[t]here is potential for the driver to inadvertently turn off the ignition due to low ignition key cylinder torque/effort."

64.     GM knew that Old GM failed to disclose in this Technical Service Bulletin that it knew that there had been fatal incidents involving vehicles with the ignition switch defect. On November 17, 2005 – shortly after Amber's death and immediately before Old GM issued the December Bulletin – a Cobalt went off the road and hit a tree in Baldwin, Louisiana. The front airbags did not deploy in this accident. Old GM received notice of the accident, opened a file, and referred to it as the "Colbert" incident. Old GM personnel familiar with this incident continued on at GM after the bankruptcy sale.

65.     GM knew that on February 10, 2006, in Lanexa, Virginia – shortly after Old GM issued the Technical Service Bulletin – a 2005 Cobalt flew off of the road and hit a light pole. As with the Colbert incident (above), the frontal airbags failed to deploy in this incident as well. The download of the SDM (the vehicle's "black box") showed the key was in the "accessory/off" position at the time of the crash. Old GM received notice of this accident, opened a file, and referred to it as the "Carroll" incident. Old GM personnel familiar with this incident continued on at GM after the bankruptcy sale.

66.     GM knew that on March 14, 2006, in Frederick, Maryland, a 2005 Cobalt traveled off the road and struck a utility pole. The frontal airbags did not deploy in this incident. The download of the SDM showed the key was in the "accessory/off" position at the time of the crash. Old GM received notice of this accident, opened a file, and referred to it as the "Oakley"

incident. Old GM personnel familiar with this incident continued on at GM after the bankruptcy sale.

67.     GM knew that in April 2006, Old GM design engineer Ray DeGiorgio approved a design change for the Chevrolet Cobalt's ignition switch, as proposed by Delphi. The changes included a new detent plunger and spring and were intended to generate greater torque values in the ignition switch. These values, though improved, were still consistently below Old GM's design specifications. Despite its redesign of the ignition switch, Old GM did not change the part number for the switch.

68.     In congressional testimony in 2014, GM CEO Mary Barra acknowledged that Old GM should have changed the part number when it redesigned the ignition switch, and that its failure to do so did not meet industry standard behavior. Mr. DeGiorgio, who approved the design change without changing the part number, continued on at GM until 2014, when he was terminated for his role in the Delta Ignition Switch crisis.

69.     GM knew that in October 2006, Old GM updated Technical Service Bulletin 05-02-35-007 to include additional model years: the 2007 Saturn Ion and Sky, 2007 Chevrolet HHR, 2007 Cobalt, and 2007 Pontiac Solstice and G5. These vehicles had the same safety- related defects in the ignition switch systems as the vehicles in the original Bulletin.

70.     GM knew that on December 29, 2006, in Sellenville, Pennsylvania, a 2005 Cobalt drove off the road and hit a tree. The frontal airbags failed to deploy in this incident. Old GM received notice of this incident, opened a file, and referred to it as the "Frei" incident. Old GM personnel familiar with this incident continued on at GM after the bankruptcy sale.

71.     GM knew that GM's practices were so deficient that key personnel did not critically examine red flags raising safety issues. For example, on November 14, 2006, the senior

manager for Old and GM's TREAD reporting was asked to pull the TREAD reports in response to a media inquiry regarding "a 2005 Cobalt fatal crash in which two teenage girls were killed October 24th in Woodville, Wisconsin. Parents and sheriff says front airbags did not deploy when vehicle hit a tree.

72.    GM knew that on November 20, 2006, Senior Manager for TREAD Reporting Dwayne Davidson was sent an email with a link to a news story that ran on KSTP in Minneapolis that featured suspected airbag non-deployment along with GM's claim of no safety recalls. Davidson testified he did not recall if he took enough interest in the story at the time to actually click on the link and watch it

73.    GM knew that in 2007, Davidson was involved in a death inquiry involving two teenage girls who were killed in a Chevy Cobalt on October 24, 2006.  The death inquiry was the result of a request for further information by NHTSA arising out of GM's quarterly report to NHTSA concerning the Wisconsin accident. As part of the death inquiry, Davidson received a report prepared by Trooper Young from the Wisconsin State Patrol. Trooper Young's report noted that the ignition switch on the vehicle "appears to have been in the 'accessory' position when it impacted the trees preventing the airbags from deploying."  Rather than critically analyzing the report Davidson only scanned the report to see if the CD was working properly. Davidson, when asked at his deposition if he connected this report to the prior media inquiry involving the two girls killed in Wisconsin, where airbags did not deploy in a 2005 Chevy Cobalt, testified that he "did not put two-and-two together."

74.    GM knew that on February 6, 2007, in Shaker Township, Pennsylvania, a 2006 Cobalt sailed off the road and struck a truck. Despite there being a frontal impact in this incident, the frontal airbags failed to deploy. The download of the SDM showed the key was in the

"accessory/off" position. Old GM received notice of this incident, opened a file, and referred to it as the "White" incident. Old GM personnel familiar with this incident continued on at GM after the bankruptcy sale.

75.    GM knew that on August 6, 2007, in Cross Lanes, West Virginia, a 2006 Cobalt rear-ended a truck. The frontal airbags failed to deploy. Old GM received notice of this incident, opened a file, and referred to it as the "McCormick" incident. Old GM personnel familiar with this incident continued on at GM after the bankruptcy sale.

76.    GM knew that on September 25, 2007, in New Orleans, Louisiana, a 2007 Cobalt lost control and struck a guardrail. Despite there being a frontal impact in this incident, the frontal airbags failed to deploy. Old GM received notice of this incident, opened a file, and referred to it as the "Gathe" incident. Old GM personnel familiar with this incident continued on at GM after the bankruptcy sale.

77.    GM knew that on October 16, 2007, in Lyndhurst, Ohio, a 2005 Cobalt traveled off road and hit a tree. The frontal airbags failed to deploy. Old GM received notice of this incident, opened a file, and referred to it as the "Breen" incident. Old GM personnel familiar with this incident continued on at GM after the bankruptcy sale.

78.    GM knew that on April 5, 2008, in Sommerville, Tennessee, a 2006 Cobalt traveled off the road and struck a tree. Despite there being a frontal impact in this incident, the frontal airbags failed to deploy. The download of the SDM showed the key was in the "accessory/off" position. Old GM received notice of this incident, opened a file, and referred to it as the "Freeman" incident. Old GM personnel familiar with this incident continued on at GM after the bankruptcy sale

79.     GM knew that on May 21, 2008, in Argyle, Wisconsin, a 2007 G5 traveled off the road and struck a tree. Despite there being a frontal impact in this incident, the frontal airbags failed to deploy. The download of the SDM showed the key was in the "accessory/off" position. Old GM received notice of this incident, opened a file, and referred to it as the "Wild" incident. Old GM personnel familiar with this incident continued on at GM after the bankruptcy sale.

80.     GM knew that on May 28, 2008, in Lufkin, Texas, a 2007 Cobalt traveled off the road and struck a tree. Despite there being a frontal impact in this incident, the frontal airbags failed to deploy. Old GM received notice of this incident, opened a file, and referred to it as the "McDonald" incident. Old GM personnel familiar with this incident continued on at GM after the bankruptcy sale.

81.     GM knew that on September 13, 2008, in Lincoln Township, Michigan, a 2006 Cobalt traveled off the road and struck a tree. Despite there being a frontal impact in this incident, the frontal airbags failed to deploy. Old GM received notice of this incident, opened a file, and referred to it as the "Harding" incident. Old GM personnel familiar with this incident continued on at GM after the bankruptcy sale.

82.     GM knew that on November 29, 2008, in Rolling Hills Estates, California, a 2008 Cobalt traveled off the road and hit a tree. Despite there being a frontal impact in this incident, the frontal airbags failed to deploy. Old GM received notice of this incident, opened a file, and referred to it as the "Dunn" incident. Old GM personnel familiar with this incident continued on at GM after the bankruptcy sale.

83.     GM knew that on December 6, 2008, in Lake Placid, Florida, a 2007 Cobalt traveled off the road and hit a utility pole. Despite there being a frontal impact in this incident, the frontal airbags failed to deploy. The download of the SDM showed the key was in the

"accessory/off" position. Old GM received notice of this incident, opened a file, and referred to it as the "Grondona" incident. Old GM personnel familiar with this incident continued on at GM after the bankruptcy sale.

84.     GM knew that in February 2009, Old GM opened another Problem Resolution regarding the ignition switches in the Defective Ignition Switch Vehicles. Old GM engineers decided at this time to change the top of the Chevrolet Cobalt key from a "slot" to a "hole" design, as had originally been suggested in 2005. The new key design was produced for the 2010 model year. Old GM did not provide these redesigned keys to the owners or lessees of any of the vehicles implicated in prior Technical Service Bulletins, including the 2005-2007 Cobalts.

85.     GM knew that just prior to its bankruptcy sale, Old GM met with Continental Automotive Systems US, its airbag supplier for the Cobalt, Ion, and other Defective Ignition Switch Vehicles. Old GM requested that Continental download SDM data from a 2006 Chevrolet Cobalt accident where the airbags failed to deploy. In a report dated May 11, 2009, Continental analyzed the SDM data and concluded that the SDM ignition state changed from "run" to "off" during the accident. According to Continental, this, in turn, disabled the airbags. GM did not disclose this finding to NHTSA, despite its knowledge that NHTSA was interested in airbag non-deployment incidents in Chevrolet Cobalt vehicles.

    *4.     GM continues to conceal the ignition switch defect.*

86.     In the culture GM inherited from Old GM and which GM took no steps to change until 2014, the Company emphasized the avoidance of recalls – not through an insistence on quality or spending on safety, but by avoiding the disclosure of safety issues and concealing safety issues of which the Company was aware. Hence, in discussing the ignition switch issues, GM avoided using the word "stall," in part to avoid the attention of regulators.  GM also actively

discouraged personnel from flagging the ignition switch defect (or any defect) as a safety issue that would require an immediate response under the TREAD Act.

87.    On March 10, 2010, Brooke Melton was driving her 2005 Cobalt on a two-lane highway in Paulding County, Georgia. While she was driving, her key turned from the "run" to the "accessory/off" position, causing her engine to shut off. After her engine shut off, she lost control of her Cobalt, which traveled into an oncoming traffic lane, where it collided with an oncoming car. Brooke was killed in the crash. GM received notice of this incident, and knew or should have known the accident was caused by the Delta Ignition Switch Defect.

88.    On December 31, 2010, in Rutherford County, Tennessee, a 2006 Cobalt traveled off the road and struck a tree. Despite there being a frontal impact in this incident, the frontal airbags failed to deploy. The download of the SDM showed the key was in the "accessory/off" position. GM received notice of this incident, opened a file, referred to it as the "Chansuthus" incident, and knew the accident was caused by the Delta Ignition Switch Defect. When a lawsuit was filed over the Chansuthus incident, GM chose to settle it confidentially and continue to conceal the defect and its horrible consequences from NHTSA and the public.

89.    On December 31, 2010, in Harlingen, Texas, a 2006 Cobalt traveled off the road and struck a curb. Despite there being a frontal impact in this incident, the frontal airbags failed to deploy. GM received notice of this incident, opened a file, and referred to it as the "Najera" incident. GM knew or should have known the accident was caused by the Delta Ignition Switch Defect.

90.    On March 22, 2011, Ryan Jahr, a GM engineer, downloaded the SDM from Brooke Melton's Cobalt. The information from the SDM download showed that the key in Brooke's Cobalt turned from the "run" to the "accessory/off" position 3-4 seconds before the

crash. On June 24, 2011, Brooke Melton's parents, Ken and Beth Melton, filed a lawsuit against GM. GM knew or should have known the accident was caused by the Delta Ignition Switch Defect.

91.    In August 2011, GM assigned Engineering Group Manager Brian Stouffer to assist with a Field Performance Evaluation that it had opened to investigate frontal airbag non-deployment incidents in Chevrolet Cobalts and Pontiac G5s.

92.    On December 18, 2011, in Parksville, South Carolina, a 2007 Cobalt traveled off the road and struck a tree.  Despite there being a frontal impact in this incident, the frontal airbags failed to deploy. The download of the SDM showed the key was in the "accessory/off" position. GM received notice of this incident, opened a file, and referred to it as the "Sullivan" incident. GM knew or should have known the accident was caused by the Delta Ignition Switch Defect.

93.    In early 2012, Mr. Stouffer asked Jim Federico, who reported directly to Mary Barra, to oversee the Field Performance Evaluation investigation into frontal airbag non-deployment incidents. Federico was named the "executive champion" for the investigation to help coordinate resources.

94.    In May 2012, GM engineers tested the torque on numerous ignition switches of 2005-2009 Chevrolet Cobalt, 2009 Pontiac G5, 2006-2009 HHR, and 2003-2007 Saturn Ion vehicles that were parked in a junkyard.  The results of these tests showed that the torque required to turn the ignition switches from the "run" to the "accessory" or "off" position in most of these vehicles did not meet GM's minimum torque specification requirements. These results were reported to Mr. Stouffer and other members of the Field Performance Evaluation team.

95.     In September 2012, Mr. Stouffer requested assistance from a "Red X Team" as part of the Field Performance Evaluation investigation. The Red X Team was a group of engineers within GM assigned to find the root cause of the airbag non-deployments in frontal accidents involving Chevrolet Cobalts and Pontiac G5s. By that time, however, it was clear that the root cause of the airbag non-deployments in a majority of the frontal accidents was the defective ignition switch and airbag system. Indeed, Mr. Stouffer acknowledged in his request for assistance that the Chevrolet Cobalt could experience a power failure during an off-road event, or if the driver's knee contacted the key and turned off the ignition. Mr. Stouffer further acknowledged that such a loss of power could cause the airbags not to deploy. At the time, GM did not provide this information to NHTSA or the public.

96.     Acting NHTSA Administrator David Friedman recently stated, "at least by 2012, GM staff was very explicit about an unreasonable risk to safety" from the ignition switches in the Delta Ignition Switch Vehicles. Mr. Friedman continued: "GM engineers knew about the defect. GM lawyers knew about the defect. But  GM did not act to protect Americans from the defect."

97.     There is significant evidence that multiple in-house attorneys also knew of and understood the ignition switch defect. These attorneys, including Michael Milliken, negotiated settlement agreements with families whose loved ones had been killed and/or injured while operating a Delta Ignition Switch Vehicle. In spite of this knowledge, GM's attorneys concealed their knowledge and neglected to question whether the Delta Ignition Switch Vehicles should be recalled. This quest to keep the Delta Ignition Switch Defect secret delayed its public disclosure and contributed to increased death and injury as a result of the ignition switch defect.

98.     The complaints from Delta Ignition Switch Vehicle owners who experienced an

ignition switch failure and a stall make it abundantly clear that GM and ESIS knew that a safety

defect was at issue:

COMPLAINT 1/21/2010: CUSTOMER WAS INVOLVED IN AN ACCIDENT ON THE 4TH
OF JANUARY. WHEN HE WAS DRIVING VEHICLE HAS SHUTTED OFF, AND HE
SMASHED AGAINST A TREE.

COMPLAINT 9/10/2007: CUSTOMER WAS VERY UPSET AND CRYING – ALLEGES D
AUGHTER INJURED B/C OF VEHICLE FAILURE THAT HAS BEEN ONGOING. CUST
STS: WE DONT WANT THIS VEHICLE ANYMORE. WE'VE HAD THIS ISSUE SINCE WE
BOUGHT IT. THE DEALER HASN'T BEEN ABLE TO FIX IT. AND NOW MY
DAUGHTER IS HURT! SHE COULD HAVE BEEN KILLED! WAS DRIVING ON HWY 80
IN PA. NEAR LOCKHAVEN DRIVING AROUND 80 MPH WHENTHE VEHICLE
COMPLETELY SHUT OFF IN THE MIDDLE OF THE HWY. NO EMERGANY LIGHTS.
NO POWER. NO ENGINE. JUST DEAD. THANK GO SHE
WASN'T HIT BY ANYTHING BUT SHE COULD HAVE! THEY SENT AN AMBULENCE
AND POLICE. SO I DON'T KNOW WHATS HAPPENING YET. BUT THI IS UNSAFE!
HOW DO I ENACT THE LEMON LAW?


COMPLAINT 11/29/2006: FIRST, I ACTUALLY HAVE A 2006 COBALT, BUT THAT
OPTION WASN'T AVAILABLE ON THE PULL-DOWN MENU ABOVE. SECOND, THE
PROBLEM I HAVE WITH MY CAR IS A SCARY ONE. MY CAR IS CURRENTLY AT
HERITAGE AUTO PLAZA. IT IS THERE BECAUSE I WAS IN A CAR ACCIDENT WHEN
THE POWER IN MY CAR COMPLETELY SHUT OFF WHILE I WAS DRIVING IT.  THE
STEERING WHEEL DID NOT WORK. THE BRAKES WERE UNRESPONSIVE, AND
EVERYTHING IN THE COCKPIT WENT DOWN TO ZERO. ONLY THE HEADLIGHTS
AND RADIO CONTINUE TO WORK. THIS IS THE SECOND TIME THIS HAPPENED.
THE FIRST TIME, I WAS ABLE TO MOVE THE CAR OFF THE ROAD. I TOOK MY CAR
TO ROSENTHAL CHEVROLET, THEY TOLD ME NOTHING WAS WRONG. IT WAS A
FLUKE, AND WOULD NEVER HAPPEN AGAIN. I AM NOW COMPLETELY AFRAID OF
MY CAR. AGAIN THEY HAVE SAID THERE IS NO PROBLEM. I HAVE SINCE
LEARNED SOME THINGSABOUT HOW THE COBALT IS MADE. IT IS VERY
DISTURBING. I DO NOT WANT THE CAR. CAN SOMEONE PLEASE CONTACT ME SO
WE CAN DISCUSS HOW TO RESOLVE THIS?

COMPLAINT 2/12/2008: ALLEGED PRODUCT ALLEGATION-INJURY/COLLISONCUST
STS. THEIGNITION AND THE SHIFTER AND THE WHEEL LOCKS UP AND THE CAR
SHUFTS OFF. A WEEK AGO I WRECKED THE VEHICLE. AND IT  IS GOING TO COST
$5000.00. THAT IS HOW MUCH DAMAGE. BUT I DO HAVE A DEDUCTABLE FOR MY
INSURANCE. THE DIR SHIP DIDN'T WANT TO TOUCH IT UNTIL YOU SAID WHAT
WE ARE GOING TO DO IT. AND EVEN WHEN I WRECKED THE CAR THE AIRBAGS
DIDN'T DEPLY. DLR STATED IT WAS IN THE CRUISE CONTROL THERE WAS A BAD

SENSOR WHICH CAUSED EVRYTHGIN TO LCOK UP. MY 2 WRISTS ARE BRUISED AND I HIT MY HEAD. BUT I HAVE BEEN BACK AND FORTH TO THE HOSPITAL AND I HAVE INSURANCE FOR ALL OF THAT.

99.     During the Field Performance Evaluation process, GM determined that, although increasing the detent in the ignition switch would reduce the chance that the key would inadvertently move from the "run" to the "accessory" or "off" position, it would not be a total solution to the problem. Indeed, the GM engineers identified several additional ways to actually fix the problem. These ideas included adding a shroud to prevent a driver's knee from contacting the key, modifying the key and lock cylinder to orient the key in an upward facing orientation when in the run position, and adding a push button to the lock cylinder to prevent it from slipping out of "run." GM rejected each of these ideas. GM engineers understood that the key fob can be impacted and pinched between the driver's knee and the steering column, and that this will cause the key to inadvertently turn from the "run" to the "accessory" or "off" position. GM engineers believed that additional changes (such as the shroud) were necessary to fix the defects with the ignition switch. The GM engineers clearly understood that increasing the detent in the ignition switch alone was not a solution to the problem. But GM concealed – and continues to conceal – from the public the full nature and extent of the defects.

100.     On October 4, 2012, there was a meeting of the Red X Team during which Mr. Federico gave an update of the Cobalt airbag non-deployment investigation. According to an email from Mr. Stouffer on the same date, the "primary discussion was on what it would take to keep the SDM active if the ignition key was turned to the accessory mode." Despite this recognition by GM engineers that the SDM should remain active if the key is turned to the "accessory" or "off" position, GM took no action to remedy the ignition switch defect or notify customers that the defect existed.

101.    In December 2012, in Pensacola, Florida, Ebram Handy, a GM engineer, participated in an inspection of components from Brooke Melton's Cobalt, including the ignition switch.  At that inspection, Mr. Handy, along with Mark Hood, a mechanical engineer retained by the Meltons, conducted testing on the ignition switch from Brooke Melton's vehicle, as well as a replacement ignition switch for the 2005 Cobalt. At that inspection, Mr. Handy observed that the results of the testing showed that the torque performance on the ignition switch from Brooke Melton's Cobalt was well below Old GM's minimum torque performance specifications. Mr. Handy also observed that the torque performance on the replacement ignition switch was significantly higher than the torque performance on the ignition switch in Brooke Melton's Cobalt.

102.    On April 29, 2013, Ray DeGiorgio, the chief design engineer for the ignition switches in the Delta Ignition Switch Vehicles, was deposed. At his deposition, Mr. DeGiorgio was questioned about his knowledge of differences in the ignition switches in early model-year Cobalts and the switches installed in later model-year Cobalts:

Q. And I'll ask the same question. You were not aware before today that GM had changed the spring – the spring on the ignition switch had been changed from '05 to the replacement switch?

MR. HOLLADAY: Object to the form. Lack of predicate and foundation.  You can answer.

THE WITNESS: I was not aware of a detent plunger switch change. We certainly did not approve a detent plunger design change.

Q. Well, suppliers aren't supposed to make changes such as this without GM's approval, correct?

A.  That is correct.

Q. And you are saying that no one at GM, as far as you know, was aware of this before today?

MR. HOLLADAY: Object. Lack of predicate and foundation. You can answer.

THE WITNESS:  I am not aware about this change.

103. When Mr. DeGiorgio testified, he knew that he personally had authorized the ignition switch design change in 2006 (though he continues to claim to the contrary), but he stated unequivocally that no such change had occurred.

104. Throughout the entirety of its corporate existence, GM received numerous and repeated complaints of moving engine stalls and/or power failures. These complaints are yet more evidence that GM was fully aware of the Delta Ignition Switch Defect and should have announced a recall much sooner than it did.

105. GM was aware of these problems year after year and nationwide, as reflected not only by the internal documents reflecting knowledge and cover-up at high levels, but in the thousands of customer complaints, some of which are reflected in the common fact patterns presented by the experiences of the named plaintiffs (as discussed above), but also, and not by way of limitation, by GM's internal complaint logs and other documents.

106. GM opened at least 38 complaint files between September 2009 and February 2014. Further, in December 2010, GM closed at least 40 complaint files – which Old GM had opened before the bankruptcy sale in July 2009 – without disclosing the safety defect to the customers, thus further indicating that Old GM's knowledge of these defective Delta Ignition Switch Vehicles carried over to GM

107. Under continuing pressure to produce high-ranking employees for deposition in the Melton litigation, GM's Field Performance Review Committee and Executive Field Action Decision Committee ("Decision Committee") finally decided to order a recall of some vehicles with defective Delta Ignition Switches on January 31, 2014. Initially, the Decision Committee ordered a recall of only the Chevrolet Cobalt and Pontiac G5 for model years 2005-2007, and those were the only cars included in the first recall ordered in February 2014. After additional

analysis, the Decision Committee expanded the recall on February 24, 2014, to include the Chevrolet HHR and Pontiac Solstice for model years 2006 and 2007, the Saturn Ion for model years 2003-2007, and the Saturn Sky for model year 2007. The public backlash continued and intensified. Eventually, GM expanded the Delta Ignition Switch recall yet again on March 28, 2014. This expansion finally included all vehicles that had (or might have) the defective Delta Ignition Switch, and covered all model years of the Chevrolet Cobalt and HHR, the Pontiac G5 and Solstice, and the Saturn Ion and Sky. The expanded recall brought the total number of vehicles recalled for defective Delta Ignition Switches to 2,191,146.

     *5.    Ms. Farmer's Accident*

108.    On December 8, 2013, Ms. Farmer was driving her car with her adult children riding as passengers. While she was driving in traffic, Ms. Farmer's ignition turned power to the car off, causing her to lose power steering and brake functions. The car left the road and continued until it hit a tree in a front-end collision. The air bags did not deploy.

109.    Ms. Farmer's accident was caused by the defective ignition switch, which caused her car to turn off during normal and reasonably foreseeable driving conditions.

110.    Ms. Farmer suffered personal injury, property damage, economic loss, and pain and suffering because of the accident.

## TOLLING OF THE STATUTE OF LIMITATIONS

111.    Any applicable statute of limitation has been tolled by GM's knowledge, active concealment, and denial of the facts alleged herein, which behavior is ongoing.

112.    The causes of action alleged herein did not accrue until Plaintiff discovered that her vehicle had the safety related defects described herein.

113.    Ms. Farmer had no reason to know that her vehicle was defective and dangerous because of GM's active concealment.

## COUNT I
## Fraud/Concealment

114.    Plaintiffs hereby incorporate by reference all allegations contained in the preceding paragraphs of this Complaint.

115.    At the time of its inception, GM knew that the ignition switch used in Ms. Farmer's car could inadvertently move from "run" to "accessory" or "off," under regular driving conditions.

116.    The fact that her car presented the above described safety hazard was material to Ms. Farmer. She had no reasonable way of learning of the hazards that GM knew about but failed to disclose. GM had exclusive knowledge of the defect.

117.    GM had a legal duty to disclose the safety risks of driving her car to Ms. Farmer.

118.    GM's failure to disclose the safety risks, and its affirmative misrepresentations regarding the safety of Ms. Farmer's vehicle, were intentional.

119.    Between July 11, 2009 and February 2014, GM actively and intentionally concealed and/or suppressed the existence and true nature of the ignition switch hazard, and minimized the extent of the danger it posed in direct and indirect communications with Plaintiff, dealers, the NHTSA, and others. GM widely advertised that falsely GM vehicles were safe and that GM was committed to safety.

120.    Ms. Farmer reasonably and foreseeably relied on GM's communications and material omissions to her detriment in continuing to own and drive her car. As a result of GM's concealment and/or suppression of facts, she sustained injuries, consisting of personal injury,

property damage, pain and suffering, the diminished value of her GM vehicle, lost wages, and the lost use and enjoyment of the car.

121.    GM's acts and omissions were taken maliciously, oppressively, deliberately, with intent to defraud, and with reckless disregard to Ms. Farmer's rights and well-being, in order to enrich GM. GM's conduct warrants an assessment of punitive damages in an amount sufficient to deter such conduct in the future, which amount is to be determined according to proof.

**COUNT II**
**Violation of Maryland's Consumer Protection Act ("MDCPA"),**
**Md. Code, Comm. Law § 13-101 *et seq.***

122.    Plaintiffs hereby incorporate by reference the allegations contained in the preceding paragraphs of this Complaint.

123.    Ms. Farmer is a "consumer" within the meaning of MDCPA, § 13-101(c)(1).

124.    Old GM and GM are  "merchants" within the meaning of MDCPA, § 13-101(g)(1). Under the June 26, 2009 Amended and Restated Master Sale and Purchase Agreement, GM expressly assumed liability for post-sale accidents involving Old GM vehicles causing personal injury, loss of life, or property damages. GM also acquired knowledge of Old GM's activities and the defective ignition switch via the mind of the employees, officers, managers, books and records obtained and/or acquired as a result of the June 26, 2009 Amended and Restated Master Sale and Purchase Agreement and subsequent Sale Order. The acts or omissions of Old GM are part of the foundation for the products liability assumed by GM. GM is also liable to Plaintiff for its independent, post-Sale violations.

125.    Old GM and GM knew the Ms. Farmer's vehicle was dangerous. Because of the life-threatening nature of the risk, its existence was a material fact that Old GM and GM concealed from Ms. Farmer in violation of Md. Code, Comm. Laws § 13-301(3).  Ms. Framer

was injured because of the omission. She detrimentally relied when she assumed that the car was reasonably safe when she purchased the car, retained ownership, and drove the car.

126.    At no time prior to February 2014 did Ms. Farmer have access to the pre-release design, manufacturing, and field-testing data, and she had no reason to believe that her vehicle possessed distinctive shortcomings. She relied on Old GM and GM to identify any latent features that distinguished her vehicle from similar GM vehicles without the ignition switch risk, and GM's failure to do so misled Ms. Farmer into believing no distinctive risk was present in her vehicle.

127.    Ms. Farmer seeks to be compensated for her injuries and any other just and proper relief available under Md. Code, Com. Laws § 13-408.

## COUNT III
## Negligence

128.    Plaintiffs hereby incorporate by reference the allegations contained in the preceding paragraphs of this Complaint. Order

129.    Old GM was negligent in designing, manufacturing, and failing to warn about the ignition switch hazard in Ms. Farmer's car, as set forth in the paragraphs above. Old GM acted unreasonably in manufacturing and selling vehicles with design, manufacturing, and informational defects and concealing such defects from Plaintiff, the public, and NHTSA.

130.    In addition, Old GM's and GM's failure to notify NHTSA and Old GM vehicle owners of safety-related defects as required by 49 U.S.C. §30101, et seq. and 49 C.F.R. §§573, 577 constituted negligence *per se*. These statutes and regulations were enacted for the protection and safety of the public, including Ms. Farmer.

131.    Old GM and GM owed a duty to consumers, including Ms. Farmer, to ensure that its vehicles were reasonably safe to operate and did not contain defective components, and to

produce vehicles with appropriate warning instructions. GM had a statutory and common law duty to warn owners of Old GM vehicles, including Plaintiff, of safety risks posed by their cars.

132.    Old GM breached its duties to Ms. Farmer by failing to use reasonable care in the design and manufacture of the ignition switch, and failing to warn her of the defect. GM has agreed to be liable for Old GM's breaches in connection with Ms. Farmer's car. GM breached its own independent duties to Ms. Farmer by failing to disclose the risks of driving the car to her and by failing to remedy the ignition switch defect in a timely manner.

133.    Old GM's and GM's negligence proximately caused the injuries and damages sustained by Ms. Farmer as set forth herein. Old GM's negligence in manufacturing and selling a vehicle containing design and manufacturing defects and Old GM's and GM's negligence in failing to adequately warn Plaintiff about known defects in her car and in violating the statutes and regulations that required Old GM and GM to recall her car for safety-related defects proximately caused the crash that left Ms. Farmer injured and her car damaged.

134.    GM is liable for compensatory damages based on Old GM's conduct and for its own independent conduct. GM is liable for fair and reasonable damages for pain and suffering, medical expenses, lost wages, repair costs, and/or damages as may be determined by the Court or the jury, as well as costs, expenses, and reasonable attorneys' fees.

## COUNT IV
## Strict Liability for Sale of Defective Products

135.    Plaintiffs hereby incorporate by reference the allegations contained in the preceding paragraphs of this Complaint.

136.    Under the June 26, 2009 Amended and Restated Master Sale and Purchase Agreement, GM expressly assumed liability for post-sale accidents involving Old GM vehicles causing personal injury, loss of life, or property damages. Plaintiff has claims for a post-sale

accident involving an Old GM vehicle that caused personal injury or property damage and GM is therefore expressly liable to Plaintiff for Old GM's conduct under Maryland's law of strict products liability.

137.    Old GM manufactured Plaintiff's vehicle, and was in the business of selling such products. Ms. Farmer was a foreseeable user and/or consumer. Old GM knew that Ms. Farmer would use the vehicle without any substantial change in its condition.

138.    Plaintiffs' car was defective and unreasonably dangerous in design because no reasonable consumer would expect the ignition to pose such a safety hazard when the product is used in a reasonably foreseeable manner.

139.    Plaintiff's car was also defective and unreasonably dangerous because of a manufacturing defect. Plaintiff's car contained an ignition switch in a condition which Old GM did not intend and, as a result, it failed to perform as safely as an ordinary consumer would expect when the product is used in a reasonably foreseeable manner.

140.    Plaintiff's car was also defective and unreasonable dangerous because it did not have an adequate warning. Plaintiff would have heeded an adequate warning. Had a proper warning been given, Plaintiff's injury would not have occurred.

141.    The defective nature of the ignition switch in Ms. Farmer's car was the proximate cause of her damages, as set forth herein.

**COUNT V**
**Breach of Implied Warranty of Merchantability**
**Md. Code, Comm. Law § 2-314 *et seq.***

142.    Plaintiff hereby incorporates by reference the allegations contained in the preceding paragraphs of this Complaint.

143.    Ms. Farmer was foreseeable to Old GM as a user and consumer of the GM vehicle she purchased.

144.    Her car was not fit for ordinary use because of the ignition switch defect.

145.    Her damages described above were each proximately caused by Old GM's breach of the implied warranty of merchantability.

146.    Under the June 26, 2009 Amended and Restated Master Sale and Purchase Agreement, GM expressly assumed liability for post-sale accidents involving Old GM vehicles causing personal injury, loss of life, or property damages. Plaintiff has claims for a post-sale accident involving an Old GM vehicle that caused personal injury or property damage and GM is therefore expressly liable to Plaintiff for Old GM's conduct under Maryland's law of warranty.

## PRAYER FOR RELIEF

A.    For judgment against Defendant General Motors LLC;

B.    For compensatory damages against GM in such amounts as the trier of fact shall deem just, fair and equitable, including but not limited to: Past medical expenses; past pain and suffering; lost earnings; and property damage to her vehicle sustained in the crash;

C.    For punitive damages against GM with respect to Plaintiff's Independent Claims;

D.    For pre-judgment and post-judgment interest;

E.    For her costs expended herein, including reasonable attorneys' fees; and to

F.    Award Ms. Farmer such other further and different relief as the case may require or as determined to be just, equitable, and proper by this Court.

## JURY TRIAL DEMAND

Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiffs request a trial by jury on all

the legal claims alleged in this Complaint.

DATED:    March 16, 2018            Respectfully submitted

_____
Gary Peller (GP0419)
600 New Jersey Avenue, N.W.
Washington, D.C. 20001
(202) 662-9122 (voice)
(202) 662-9680 (facsimile)
peller@law.georgetown.edu
Attorney for Plaintiff Tina Farmer

**CERTIFICATE OF SERVICE**

I hereby certify that a true copy of the above document was served upon the attorney of record for each other party through the Court's electronic filing service on March 16, 2018, which will send notification of such filing to the e-mail addresses registered.

/s/ *Gary Peller*
Gary Peller